**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

THOMAS WAYNE JONES                           :

      Petitioner                               :

v                                            :          Civil Action No. DKC-05-2306

JAMES PEGUESE, *et al.*                      :

      Respondents                              :
o0o

**MEMORANDUM**

    The above-captioned Petition for Writ of Habeas Corpus was filed on August 22, 2005.

Pursuant to court Order, Respondents have filed an Answer seeking dismissal of the Petition on its

merits.  Paper No. 10.  Upon review of the pleadings and exhibits submitted, this court finds that a

hearing in this matter is not necessary.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the

United States District Courts* and Local Rule 105.6;  *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th

Cir. 2000) (petitioner is not necessarily entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the

reasons set forth below, the Petition for Writ of Habeas Corpus shall be denied.

**Background**

    Petitioner was charged in the Circuit Court for Prince George's County with first degree

felony murder, kidnapping, robbery with a deadly weapon, and use of a handgun in a felony.  Paper

No. 10 at Ex. 1.  At a preliminary hearing, Petitioner moved to suppress statements he made to the

police approximately twenty hours after his arrest. *Id*. at Ex. 2– 8.  Petitioner argued his statements

confessing to the crimes were involuntary because he had smoked marijuana and PCP the night of

his arrest and sustained an injury to his eye while in custody.[1]  He also alleged that his appearance

---

[1]  Detective Rositch testified that the injury occurred when Petitioner was pulled from the ceiling
(continued...)

before a Commissioner was deliberately delayed in order to obtain a confession. *Id.* In addition, Petitioner's mother testified that an attorney had been retained for her son prior to his arrest and she had communicated that fact to the arresting officer. *Id.* at Ex. 8, pp. 89– 105. During Petitioner's interrogation he received Miranda warnings, then was told that the police wanted to help him but could not unless he told them what had happened. *Id.* at Ex. 6 at pp. 61– 65. Counsel asserted that Petitioner's statement that he was not sure whether he should say anything was an equivocal assertion of his right to remain silent requiring the cessation of all questioning. *Id.* at Ex. 8, p. 138; pp. 159– 160. In addition, counsel maintained that the totality of the circumstances of Petitioner's statement rendered it an involuntary confession. *Id.* at pp. 109– 160. The judge, however, gave no credibility to the testimony of Petitioner's mother, accepted the officers' assertions that Petitioner was coherent at the time he gave his statement, and denied the motion to suppress. *Id.* at pp. 162– 167.

The following facts were presented to a jury concerning the robbery and subsequent murders of Gary Gulston and Jamal Johnson. Mr. Gulston, an engineering student at Capitol College, was involved in dealing drugs. Michele Gulston, Mr. Gulston's cousin with whom he shared a house, reported a robbery to the Prince George's County police. *Id.* at Ex. 9, pp. 33– 58. When the police arrived at her house they discovered Mr. Johnson's body. *Id.* at pp. 27– 30. His hands were bound and he had been shot once in the back of the head and once in the back. *Id.* at p. 28. Police responding to another location in Forestville, Maryland discovered the body of Mr. Gulston in the

---

[1](...continued)
during an escape attempt, causing Petitioner to strike his face on the side of a table in the interview room. Paper No. 10 at Ex. 4.

basement.  *Id*. at Ex. 9, pp. 30– 32.  He also had suffered a gunshot wound to the back of the head. *Id*.

Investigation of the two murders revealed that Gulston and Johnson were targets of an armed robbery.   Petitioner and his friends Donald Gutrick, Jason Pinkney, and Derrick Smith, decided to rob Gulston, drove to his house on Alpine Street, waited for him to arrive, took him at gun point to Michelle Gulston's apartment, and demanded money.  Michelle Gulston, who was in the apartment with her young son at the time of the robbery, was bound and ordered to keep her face in a pillow while the men were in her apartment. *Id*. at Ex. 9, pp. 33– 58.  At trial she testified that two men with guns burst into her bedroom yelling "it's a stick up" and began ransacking her bedroom looking for money.  *Id*. at pp. 37– 38.   She could hear others questioning Gulston about money and she heard him say the money was at his mother's house.  *Id*. at p. 39.  Ms. Gulston testified that, prior to leaving her apartment, the armed men brought someone, presumably Johnson,[2] into her bedroom and placed him on the bed beside her.  *Id*. at pp. 40– 41.  She said she could not see the men's faces clearly because she was face-down in a pillow and the assailants' faces were covered with hoods. *Id*.  Ms. Gulston recalled that approximately 20 minutes later, someone returned to her bedroom and took Johnson to the next room, turned up the television in her room, and closed the door. *Id* at pp. 42– 43.  She then heard two gunshots. *Id*.  After Ms. Gulston heard the men leave her apartment she untied herself and called the police.[3]  *Id*. at p. 44.  Ms. Gulston further testified that the keys to her

---

[2] Ms. Gulston could not confirm that the person brought into the room was Mr. Johnson because she was not permitted to see anything during her ordeal.

[3] Prince George's Police Officer Etiene Jones responded to the call.  Upon arriving at the apartment she discovered Johnson's body lying on the floor in a bedroom face down, with a gunshot wound to the back of his head.

car were missing, along with jewelry and a .25 caliber pistol that had been in her purse. *Id*. at pp. 45– 49.

After Gulston told his assailants that the money they wanted was at his mother's house, he was taken to the Forestville address. The house was then ransacked in search of money and drugs and money was taken from a safe. Gulston was placed on the floor. Petitioner placed a pillow over his head and Donald Gutrick shot him in the back of the head. Joseph Holmes, a police officer who testified at trial, reported to the Forestville home in response to a call. *Id*. at Ex. 9, pp. 30– 33. He testified that he entered the home after two canine units went inside and discovered Gulston's body in the basement, lying face down, pillow over his head, with a gunshot wound to the head and back. *Id*.

Forensic evidence introduced at trial included the testimony of Lynn Philbin, an evidence technician with the Prince George's County Police. *Id*. at Ex. 10, pp. 5– 16. He testified that he recovered the following items from the apartment: a .25 caliber bullet; an unfired bullet from the top of a clothes hamper; a .25 caliber bullet casing on the bedroom floor; a .45 caliber automatic shell casing on the bedroom floor; a defective bullet; a triple beam balance scale found on the floor underneath a bed; 179 grams of suspected crack cocaine; a shoe box filled with plastic bags; razor blades; a pager; and $2500 in cash inside a jacket pocket in the same bedroom where Mr. Johnson's body was found. *Id*. The car believed to be used by the assailants, a 1986 Toyota, was fingerprinted but no identifiable prints were recovered. *Id*. Another evidence technician, Jan Veeder, testified as to the forensic investigation of the Forestville residence where Gulston was killed. *Id*. at pp. 17– 27. Veeder testified that there was no sign of forced entry into the house. *Id*.

He also testified that Gulston's body was found in the basement along with a pillow with a circular defect in it, consistent with a bullet hole.  *Id.*

The State also called Joseph Williamson, a firearms expert with the Federal Bureau of Investigation.  *Id.* at Ex. 10, pp. 28– 40.  Williamson testified that the bullet recovered from Johnson's body was a .25 caliber bullet fired from a .25 caliber automatic pistol and the bullet recovered from Gulston's body was fired from a .9mm Smith and Wesson pistol.  *Id.*  No forensic evidence was introduced tying Petitioner to the scene of either crime.

Gulston's mother, Jeanette Gulston, was called as a witness by the state. *Id.* at Ex. 10, pp. 41– 55.  She testified that at the time of her son's murder she was out of town and that prior to leaving she had cleaned her house from top to bottom.  *Id.*  She explained that upon her return to her house she found it had been ransacked and that the safe, which had been locked prior to her trip, was unlocked and its contents removed.  *Id.*  She stated that the safe had contained certificates of deposit, $10,000 in savings bonds and approximately $4,000 in cash received from an insurance policy.  *Id.*

In order to introduce Petitioner's statement given to the police, the State called as witnesses Detectives Hickey and O'Berry to testify about the circumstances leading up to his statement. *Id.* at Ex. 10, pp. 56– 80; pp. 81– 89; and pp. 189– 192.  Hickey testified that Petitioner was arrested at 7:05 p.m. on August 2, 1993.  *Id.* at pp. 57– 58.  He described Petitioner's behavior at the time of his arrest as strange and erratic, including jumping up and down and requesting to use the bathroom in the woods prior to being taken to the police station.  *Id.*  Hickey testified that he called O'Berry out of an interview room at the police station, where O' Berry had questioned Petitioner briefly. *Id.* at pp. 59– 61.  Hickey explained that he asked O'Berry to stop questioning Petitioner

at that time because he had indicated on a form that he had smoked marijuana and PCP earlier that evening. *Id*. Hickey further testified that he felt Petitioner should be allowed to sleep off the effects of the drugs before questioning was resumed. *Id*. According to Hickey's testimony, Petitioner slept in the interview room until approximately 4:00 a.m. the next morning, when Hickey offered to get him something to eat. *Id*. at pp. 60– 62. At that time, he noticed that Petitioner's eye was red and starting to swell. *Id*. at p. 64. Petitioner refused Hickey's offer to obtain medical attention for the injury, but Petitioner was taken to the hospital anyway. *Id*. at p. 65. Petitioner was returned to the police station at approximately 6:45 a.m. and, according to Hickey, it appeared that the effects of the marijuana and PCP had worn off. *Id*. at pp. 65– 66. Hickey admitted, however, that no medical opinion was sought regarding whether Petitioner was still under the influence of the drugs. *Id*. at p. 75. On cross-examination, Hickey also admitted that Petitioner was not taken to see a Commissioner until approximately 5:00 p.m. on August 3, 1993, the day following his arrest, and that under normal procedures a suspect would be taken before a Commissioner immediately. *Id*. at pp. 67– 71.

Detective O'Berry testified that, on the evening of the arrest, he read Petitioner his rights and asked him how far he went in school. *Id*. at p. 82. Petitioner replied that he had completed the eighth grade. *Id*. On the advice of rights form used, Petitioner indicated that he had smoked "PCP and weed" the evening of his arrest but could not recall the time he did so. *Id*. at p. 83. Petitioner was asked if he was under the influence of drugs at the time and he answered that he was. *Id*. O'Berry stated that Petitioner never asked for a lawyer and that he began asking Petitioner about the deaths of Gulston and Johnson. *Id*. at pp. 84– 86. O'Berry explained that during the initial phase of questioning he wrote down Petitioner's answers to questions he asked and that Petitioner

appeared to understand what was going on.  *Id*.  It was during this initial phase that Petitioner

denied his involvement in the murders and the interview was interrupted by Hickey. *Id*. at p. 87.

The incriminating statement was obtained by Detective Richard Delabrer, who questioned

Petitioner from 7:30 a.m. to 12:45 p.m. on August 3, 1993.  Delabrer testified that prior to

interviewing Petitioner, he advised him of his rights again.  *Id*. at Ex. 10, pp. 116– 118.  Delabrer

testified that Petitioner admitted to being present when Gulston and Johnson were killed but denied

actually killing either one of them.  *Id*. at p. 119.   The statement taken from Petitioner was

introduced as evidence and was as follows:

> A few weeks ago I was over this girl named Tee's house getting
> high talking when all of a sudden Don called me back to the
> bedroom and asked me was I trying to get some quick money so I
> said yes and he told me that we were going to rob some dude named
> Gary.  So me, Don, Jason and Derrick waited until the next morning
> and went to the Hill Top Apartments and parked.  So me and Don
> went in some woods waiting for Gary while Jason and Derrick was
> in the car, and Gary pulled up and went in the house.  So me and
> Don went to get Jason and Derrick by the time we got back to his
> building he was leaving so we waited in the building until he came
> back and when he came back we took him into the apartment and
> laid everyone down and asked where's the money and drugs and
> Gary told us it was over his mother's house, but he said he would
> have to take us there because there was an alarm on the door.  So me
> and Don took him there and found a safe and $4,000.  So Don kept
> saying this ain't all the money and Gary on saying it's more but I
> don't know where it's at because my brother hid it and Don thought
> he was lying and he went and got a pillow and we is about to kill
> you and I told Don no let's take him back and call his brother and
> Don said no give me the gun.  I'll do it.  Just put the pillow over his
> head.  So I did it and Don shot him once in the head.  So we left and
> went back to Hill Top and I told Don I'll get the car ready while he
> go get them and when he upstairs I heard two shots and they came
> running out to the car and we went over to Jason's house in Seat
> Pleasant and split the money four ways and Derrick has a .25 that he
> got.
>
> Q: Who shot the second guy?

A:  Derrick and Don.

Q:  Where were you when the second guy was shot?

A:  In the car.

Q:  What did they tell you about the second shooting?

A:  Derrick shot him in the back with a .25 and Don finished him
with the .45.

*Id*. at pp. 125– 127.

On cross-examination, Delabrer confirmed that Petitioner's eye was swollen at the time he was questioned, but he did not take him to a doctor.  *Id*. at p. 128.  In addition Delabrer admitted knowing that Petitioner was under the influence of PCP at the time of his arrest but did not arrange for a drug test to determine whether the drug was still present in his system. *Id*. at p. 129.  Delabrer also admitted that he did not take Petitioner to see a Commissioner for arraignment purposes.  *Id*. at p. 130.

Detective Rositch, also called by the state, testified that while questioning another suspect in a separate room he heard a disturbance in the room where Petitioner was being held. *Id*. at pp. 132– 143.  Upon investigating, Rositch saw that the chairs in the room had been disturbed and that Petitioner appeared to be under the influence of PCP. *Id*. at pp. 133– 137.  In order to prevent Petitioner from injuring himself, Rositch testified that he removed the chairs from the room. *Id*. at p. 134.  Shortly after Rositch left, he heard another disturbance coming from the room where Petitioner was held.  *Id*. at pp. 136– 137.  When Rositch returned to the room he saw Petitioner's legs hanging down from the ceiling.  *Id*.  Petitioner had moved dropped ceiling tiles and was holding onto the metal structures on the ceiling.  *Id*.  Rositch  held onto Petitioner's legs and pulled

him down.  *Id*.  When Petitioner came down from the ceiling he struck a table and injured his eye. *Id*.

Derrick Smith, who had already been convicted of offenses stemming from the same circumstances, was called as a witness by the state. *Id*. at pp. 144– 188.  Although he was expected to testify in compliance with the statement he provided to the Prince George's police, he denied making any of the statements attributed to him. *Id*. at pp. 145– 146. After the jury was excused from the courtroom, Smith was questioned by defense counsel. *Id*. at pp. 156– 159.  Smith claimed that he had signed the statement he was shown but that all of the information above his signature was fabricated by the police. *Id*.  Smith denied any involvement in the robbery or the murders. *Id*. Smith continued to claim that police had written some of the answers to the questions on the form and the content of answers written in his handwriting were dictated to him. *Id*.  He claimed that he was forced to sign his name to the statement, that he did not witness any of the murders, and that he had not seen Petitioner on the day of the murders. *Id*.  The jury was brought back to hear Smith's testimony that he was not involved in the murders and did not speak to Petitioner about the crime. *Id*.  On cross-examination Smith claimed that if he did not do what he was told to do by police they would hit him, causing his lip to bleed. *Id*.  He further claimed that he was denied medical care for the injuries he received. *Id*.  In addition, Smith claimed he was denied an attorney and that he refused an offer of a plea bargain. *Id*.  After Smith's testimony was concluded, the state moved to admit his statement and defense counsel objected to its admission.  *Id*.  The court reserved ruling on the motion pending further testimony.

Officer Hickey was recalled as a witness to testify about the circumstances surrounding a statement taken from Gary Maye, who was questioned about the murders and implicated Petitioner

in his statement. *Id*. at pp. 189– 192.   Maye testified, outside of the presence of the jury, that the statement taken by police was not his statement, he did not say what was indicated on the statement, and  he did not sign the statement. *Id*. at pp. 92– 100.   Hickey testified that he took Maye's statement, recalled him writing the answers to the questions Hickey had written, and witnessed Maye initialing each answer and signing the statement. *Id*. at pp. 189– 191.   Although Maye was instructed not to leave the courthouse because he was subject to being recalled as a witness, he could not be located after Hickey finished testifying. *Id*. 10 at p. 101.   A bench warrant was issued for his arrest, but he was never located and his testimony, as well as Hickey's testimony  regarding his statement, was stricken from the record. *Id*. at Ex. 11, pp. 43–44.

Dr. Theodore King, Jr., an assistant medical examiner to the Chief Medical Examiner in Baltimore, testified about the autopsy performed on Gary Gulston and Jamal Johnson. *Id*. at p. 11. Through his testimony it was established that Gulston died of a gunshot wound to the head, and it was established that Johnson suffered a gunshot wound to the head and back. *Id*. at pp. 12– 14 and pp.17– 18.   Dr. King also testified that there was no physical evidence indicating that the gun used to kill both men was fired at close range, but that use of a pillow or blanket as an intermediate target would eliminate evidence of that type. *Id*. at p. 20.

Detective Rositch was recalled to the stand for purposes of introducing the statement of Derrick Smith. *Id*. at p. 19.   He testified that he advised Smith of his *Miranda*[4] rights before taking his statement.   He stated that he did not threaten, strike, or otherwise injure Smith during questioning. *Id*. at p. 22– 24.   A redacted version of Smith's statement was then admitted into evidence over counsel's objection. *Id*. at p. 24.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

The jury convicted Petitioner of the first degree felony murder of Gary Gulston, kidnapping, robbery with a deadly weapon, and use of a handgun in a felony.  The court sentenced him to serve life without the possibility of parole for the felony murder conviction and imposed two consecutive twenty year terms for the kidnapping and robbery.[5]

Petitioner appealed his conviction to the Court of Special Appeals. Paper No. 10 at Ex. 14 and 15.  His convictions were affirmed in an unreported opinion.  Petitioner did not file an appeal to the Court of Appeals. *Id*. at Ex. 16.

On November 12, 1998, Petitioner filed a post-conviction petition raising ineffective assistance of trial and appellate counsel as well as trial court error as grounds for relief. *Id*. at Ex. 17.  Specifically, with respect to trial counsel Petitioner alleged that counsel was ineffective for failing to: call an expert witness during the pre-trial suppression hearing regarding the effects of PCP; call Petitioner as a witness during the suppression hearing to testify about his lack of understanding due to his PCP use; object to the introduction of Petitioner's drug use, erratic behavior, and attempt to escape as inadmissible bad character evidence; object to the admission of Derrick Smith's conviction or request a limiting instruction; and properly object to admission into evidence the redacted statement of Derrick Smith.  *Id*. at pp. 3-- 7.  Regarding appellate counsel's performance, Petitioner alleged he was ineffective for failing to raise the inadmissibility of the redacted statement of Derrick Smith, which contained a statement attributed to Donald Gutrick implicating Petitioner in the murder of Gary Gulston. *Id*. at p. 10. Petitioner further alleged that the trial court erred by admitting the statement of Derrick Smith inasmuch as it was inadmissible hearsay.  *Id*. at p. 11.  After a hearing, post-conviction relief was granted and a new trial was

---

[5]  The handgun conviction was merged for purposes of sentencing.

ordered on the basis that trial counsel's failure to object to Gutrick's statement contained in Smith's statement fell below a standard of reasonableness. *Id*. at Ex. 20.

The state filed an application for leave to appeal the decision of the post-conviction court with the Court of Special Appeals[6], alleging that Gutrick's statement was admissible as the statement of a co-conspirator made during the course and in furtherance of the conspiracy. The state did not make that argument at the post-conviction hearing nor in its initial appellate brief, but raised it for the first time in a reply brief. Based on that failure, and on a motion to strike filed by Petitioner's counsel, the Court of Special Appeals did not consider the merits of the state's argument. Upon a motion to reconsider filed by the state, the Court of Special Appeals revised its opinion and ordered a limited remand for the post-conviction court to determine whether the hearsay statement was admissible under the co-conspirator exception to the hearsay rule. *See Jones v. State*, 138 Md. App. 178, 771 A. 2d 407 (2001). A timely petition for writ of certiorari, filed by Petitioner, was granted and the Court of Appeals affirmed the judgment of the Court of Special Appeals. *See Jones v. State*, 379 Md. 704, 843 A. 2d 778 (2004). The issue on appeal was whether the Court of Special Appeals abused its discretion by remanding the case to the post-conviction court for consideration of an issue that was not properly raised by the state in its application for leave to appeal. The Court of Appeals, in affirming the decision, reasoned that "[w]hile the authority to review unpreserved issues is discretionary, it should not be exercised when it will work an unfair prejudice to the parties." *Id*. at 714, 843 A. 2d at 784. The court concluded that prejudice was not generated "against either petitioner or the post-conviction court" by the remand and that

---

[6] Petitioner did not, at that time, file a cross application for leave to appeal concerning the issues on which he had not prevailed.

"orderly and efficient judicial administration, strongly favors the outcome determined by the intermediate appellate court." *Id*. at 715– 16, 843 A. 2d at 785.  The court explained further that:

> If the [post-conviction] judge determines that the statement is inadmissible, then Jones will receive his new trial.  If, on the other hand, the judge determines that the statement is admissible, the post-conviction court will deny his post-conviction petition for relief based on ineffective assistance of counsel because in that case his rights were never violated.

*Id*. at 716, 843 A. 2d at 785.

On October 14, 2004, a second post-conviction hearing was held to consider whether Smith's statement, referencing the inculpatory statement by Gutrick, was admissible and whether counsel was ineffective for failure to object to the admissibility of the statement.  Paper No. 10 at Ex. 33. On October 20, 2004, the post-conviction court issued a memorandum opinion concluding that the statement was admissible as a statement of a co-conspirator in furtherance of the conspiracy.  *Id*.  Based on the admissibility of the statement, the post-conviction court then concluded that trial and appellate counsel were not ineffective for failing to object to the admission of the statement.

Petitioner filed an application for leave to appeal with the Court of Special Appeals asserting only that Smith's statement was inadmissible and that counsel's performance was deficient in failing to object to its admission.  Petitioner did not seek leave to appeal from the rejection of his other claims in the initial post conviction ruling. The application was summarily denied.

## Threshold Considerations

### Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he must have exhausted each claim presented to the federal court by pursuing remedies available in state court. This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. §§ 2254(b) and (c). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal (and thereafter seeking *certiorari* to the Court of Appeals), and with other claims by way of a post-conviction petition, followed by seeking leave to appeal in the Court of Special Appeals.

Petitioner no longer has any state direct appeal or collateral review remedies available to him with respect to the claims raised in this Court; thus, his claims are considered exhausted for the purpose of federal habeas corpus review.

### Procedural Default

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U. S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post conviction relief). A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis

of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th

Cir. 1999).

As the Fourth Circuit has explained:

> If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1.

*Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

If a procedural default has occurred, a federal court may not address the merits of a state

prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice

that would result from failing to consider the claim on the merits, or (2) that failure to consider the

claim on the merits would result in a miscarriage of justice, *i.e.* the conviction of one who is actually

innocent.[7]  *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Breard*, 134 F.3d at 620. "Cause"

consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise

the claim in state court at the appropriate time." *Id.* (quoting *Murray*, 477 U.S. at 488).   Even

where a petitioner fails to show cause and prejudice for a procedural default, a court must still

---

[7]     Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief.  *See Murray v. Carrier*, 477 U.S. at 496.  "[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.*; *see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003).  Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. *See Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice.   *See Schlup v. Delo*, 513 U. S. 298, 314 (1995).

## Statute of Limitations

Respondents do not contend -- and the court does not find -- that the petition is time-barred pursuant to 28 U.S.C. §2244(d).

## Standard of Review

Because the Petition was filed after April 24, 1996, it must be evaluated pursuant to amendments to the habeas corpus statutes contained in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified in scattered sections of 28 U.S.C.).[8]  Under the AEDPA, federal courts are no longer authorized to correct mere error in state court proceedings, but must instead exercise the more limited review set forth in Section 2254(d).  That section now provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> 1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2) (as amended). In reviewing Petitioner's attack on his state court conviction, this court presumes that the state court's factual determinations are correct.  Petitioner

---

[8]    *See Brown v. Angelone*, 150 F.3d 370 (4th Cir. 1998).

bears the burden of rebutting this presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor observed that:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id*. at 412-13.  The Court noted that "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."  *Id*.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409.  With these standards in mind, this court addresses the claims now before it.

## Claims

Petitioner raises the following grounds for relief: (1) trial and appellate counsel were ineffective for failure to object to inadmissible hearsay evidence; and (2) trial counsel was ineffective for failing to call Petitioner as a witness at the suppression hearing.

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The second prong requires the court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A strong presumption of

adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors.  *Id.*  at 696.

Failure to Object to Hearsay Evidence

Petitioner alleges that both trial and appellate counsel were ineffective when they failed to object to or raise as a ground for appeal the trial court's admission of a statement by Derrick Smith, who was charged and convicted of the same offenses in a separate trial.  At the time of Petitioner's trial, Smith was already serving a sentence as a result of his conviction.  The statement Smith allegedly provided the police[9] included the following statements:

> [Smith]: Me and Don [Gutrick], T.J.,[10] and Jason meet over Tee's house and then Don called T.J. in the back room. * * * * So we went to Gary house and robbed him.  We was looking for some drugs and money.  But there was no money there so Don and T.J. left the apartment with Gary and they did not come back with him.  So me and Jason was waiting for them to come back.  So [when] they came back Don came up stairs and said are you ready to go and we said yes, but before we left we asked him did they get anything and he said yes so we rolled.  And then we went over Jason's house to count the money.  We counted about 5000 dollar and we all got about 1100 dollars a peace.

> [Detective Rositch]: Did Don [Gutrick] or T. J. say anything when they came back?

> [Smith]: When Don came back upstairs Jason asked him where the other person was at and he said we killed him.

Ex. 26 at pp. 9– 10.

---

[9] When Smith testified at trial he denied making the statement.  He claimed he was forced to write part of the statement and the remaining parts were made up by the police.

[10] Petitioner was known by his acquaintances as T.J..

Petitioner assigns error to trial counsel's failure to object to the statement "we killed him" because it is hearsay within hearsay. He further claims appellate counsel was ineffective for failing to raise it in his direct appeal. Paper No. 1 at pp. 7– 10. Petitioner explains that when Smith was called as a witness by the state he unexpectedly denied any involvement in or knowledge of the crimes. *Id*. at p. 7. The state was permitted to impeach Smith with the statement he provided to police, using portions of the statement redacted by the trial court. *Id*. Defense counsel objected to the admission of the statement in its entirety, but declined several opportunities to request redaction of the prejudicial statement attributed to Gutrick. *Id*. at p. 8. At the first post-conviction hearing held in this case, trial counsel characterized his failure to object to that portion of the statement as an oversight. Ex. 19 at p. 87. The post-conviction court first issued a decision that:

> Counsel's performance, although generally excellent, did fall below a standard of reasonableness when he failed to object to the admission of the multiple hearsay statement. This, when combined with the cumulative effects of the other, more minor mistakes did result in prejudice to the defendant.

Ex. 20 at p. 6.

After the issue of whether the statement was admissible was remanded to the post-conviction court by the Court of Special Appeals, the post-conviction court concluded that it was admissible. Ex. 33. The court reasoned that Derrick Smith, Don Gutrick and Jason Pinkney were co-conspirators with Petitioner in the robbery, kidnapping and murders of Gary Gulston and Jamal Johnson. *Id*. at p. 6. The court noted that while the three men were not charged with conspiracy, an indictment on conspiracy charges is not a prerequisite for the application of Md. Rule 5-

803(a)(5).[11]  *Id*.  In reaching the conclusion that the statement fit the co-conspirator exception, the second post-conviction court agreed with the Court of Special Appeals when it observed that:

> Gary Gulston's murder was part and parcel of the kidnapping, house breaking and robbery of Gary Gulston.  The underlying felonies were complete only after [Petitioner] removed the stolen items from Jeanette Gulston's house, returned to Michelle Gulston's apartment, reunited with his confederates and escaped.

Ex. 33 at p. 8, *citing Jones v. State*, Slip Op. No. 222 (Sept. Term 1997) Ex. 16 at p. 25.

In addition, the post-conviction court noted that both Petitioner's statement and Smith's statement included the admission that the four men returned to Jason Pinkney's house to split the money four ways.  Ex. 33 at p. 8.  The court noted that in its opinion affirming Petitioner's conviction on direct appeal, the Court of Special Appeals concluded that fleeing the scene and splitting the robbery proceeds were a part of the conspiracy.  Accordingly, the court concluded that the statement attributed to Gutrick ("we killed him") was a statement made during the course and in furtherance of a conspiracy and was therefore admissible evidence.  *Id*.  The court rejected Petitioner's reliance on *United States v. Blakey*, 960 F. 2d 996 (11th Cir. 1992) to support his claim that the statement did not fit the hearsay exception.[12]  With respect to Petitioner's ineffective assistance of counsel claim, the court observed that "[e]ven if trial (or appellate) counsel timely objected to (or raised on appeal) the admissibility of such evidence as hearsay within hearsay, counsel's objection would justifiably be overruled."  *Id*. at p. 10.

---

[11] Md. Rule 5-803(a)(5) provides that hearsay is admissible even though the declarant is available as a witness when the statement is offered against a party and is a statement by a coconspirator of the party during the course and in furtherance of the conspiracy.

[12] The statement at issue in *Blakey* was made by a co-conspirator. The *Blakey* court found that it was not made in furtherance of the conspiracy, but rather for purposes of shifting blame, and thus was inadmissible under the hearsay exception.  *Id*. at pp. 998-9.

The state court's finding that the statement was admissible and that counsel's failure to object or to raise it on appeal does not constitute error is not an unreasonable application of well-established legal principles.  Having failed to establish that counsel's performance was deficient, there is no basis upon which to find that counsel was ineffective and no basis for federal habeas relief on this claim.

Suppression Hearing

Petitioner next claims that counsel was ineffective in failing to call Petitioner as a witness at the pre-trial suppression hearing so that he could testify as to his state of mind at the time he provided an incriminating statement to police.  It is undisputed that Petitioner was under the influence of PCP and marijuana at the time of his arrest.  His behavior was described as erratic and bizarre, prompting police to end initial efforts to question him.  Questioning was, however, resumed several hours later when detectives conducting the investigation observed a change in Petitioner's demeanor and believed the effects of the narcotics had subsided.  At the pre-trial suppression hearing counsel questioned officers as to their level of expertise in determining if someone was under the influence and demonstrated that Petitioner was not provided with a blood test to determine if the narcotics were still in his system.  Counsel did not call a defense expert to testify as to the effects of PCP, nor did counsel call Petitioner to the stand to testify as to his state of mind.

At post-conviction, counsel representing Petitioner at the suppression hearing explained that he consulted a doctor about the effects of PCP prior to the suppression hearing and, based on the information provided, opted not to call the doctor as an expert.  He explained that he did not call Petitioner as a witness because the judge at the suppression hearing would not grant his request for use and derivative use immunity with respect to any testimony provided by Petitioner.

In rejecting this claim, the post-conviction court relied on counsel's testimony that his decision not to call Petitioner as a witness was a tactical decision. Ex. 20 at pp. 2–3. The court observed that failure to call Petitioner as a witness was not deficient performance inasmuch as it protected him from potentially damaging evidence being discovered by the state for later use at trial. *Id*.

Respondent asserts that this claim is procedurally defaulted due to Petitioner's failure to challenge the post-conviction court's rejection of this claim in an application for leave to appeal in the Maryland Court of Special Appeals. Paper No. 10 at p. 26.  The procedural default doctrine applies where a state court refuses to consider the merits of a claim on procedural grounds or where procedural grounds would clearly bar consideration of the claim by a state court.  *See Teague v. Lane*, 489 U. S. 288, 297-98 (1989).  In the instant case the time for raising the claim for appellate review has expired, therefore, the claim is procedurally defaulted.   The merits of the claim need not be addressed by this court.   In any event, Petitioner has not shown that the post conviction court ruling was an unreasonable application of clearly established federal law or based on an unreasonable determination of facts.   As found by the post conviction court, counsel's concern that any testimony provided by Petitioner would be used to further develop the case against him, in light of the judge's indication that no immunity would be provided, was well-placed.  The  failure to call Petitioner as a witness was not deficient performance, but rather required the exercise of sound strategy.  Far from prejudicing Petitioner, counsel's decision not to call Petitioner as a witness at the suppression hearing protected him from potentially damaging evidence being discovered by the state for later use at trial.

**Conclusion**

Upon review of the pleadings, this court determines that Petitioner is not entitled to federal habeas relief.  There is no basis for finding constitutional deficiencies in the state court proceedings, Petitioner having failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction or appellate relief.   Accordingly, the petition shall be dismissed with prejudice by separate Order which follows.


__February 2, 2007__                            _____/s/_____
Date                                                         DEBORAH K. CHASANOW
                                                                United States District Judge

23